George H. SHORT and Frances C. Short, individually, and Diane Short by George H. Short and Frances C. Short, her next friends, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 2864.

United States District Court
D. Delaware.

Sept. 21, 1965.

As Amended Sept. 30, 1965.

Paul R. Reed, Georgetown, Del., for plaintiffs.

Alexander Greenfeld, U. S. Atty., and Alfred J. Lindh, Asst. U. S. Atty., Wilmington, Del., for defendant.

CALEB M. WRIGHT, Chief Judge.

Plaintiffs seek to hold the United States liable for injuries allegedly caused by Glenn Thornton, a Petty Officer in the United States Navy. They claim that Thornton was acting within the scope of his employment when a car driven by him was involved in an accident which caused injury to plaintiff, Diane Short.

■ In order for the United States to be held liable for the torts of its employees under principles of vicarious liability, the employee must have been acting within the scope of his employment when the tort was committed. See 28 U.S.C.A. §§ 1346, 2671.

The United States has moved for summary judgment on the ground that Thornton was not acting within the scope of his employment at the time the alleged tort occurred. Plaintiffs have also moved for a summary judgment to the effect that Thornton was acting within the scope of his employment as an employee of the United States, and the United States may be held liable for his torts as its agent or servant. These cross motions are before the court.

At the time the accident in question occurred, Thornton was the manager of the Club Oasis, a facility for both officers and enlisted men at the naval station at Fort Miles, Delaware.[1] His duties were to order supplies for the club from the Naval Supply System at Bainbridge and "to do everything to insure proper operation of the club."[2] Although it was his duty to keep a check on the club's five

bartenders to see that they handled things in a sanitary manner and recorded all sales, Thornton had established working hours of 8:00 a. m. to 4:30 p. m.[3] Lieutenant Richard Luby, Thornton's immediate superior, stated that he had told Thornton to keep an eye on the establishment when he was at the club as a social visitor.[4] There was, however, no requirement that Thornton be at the club in his off duty hours or that he supervise the club's operations in the evening.[5] Thornton could not and would not be disciplined if he did not come to the club in the evening.[6] Thornton testified that he was instructed by Lt. Luby, during the early part of the week of Jan. 13, 1964, to keep his eye on one specific bartender,[7] however Lt. Luby disputed this statement.[8]

During the week of January 13, 1964, the club had a number of calls for a drink which required lime juice. Thornton tried to obtain it through Bainbridge, his normal supply center but was unable to do so. On Wednesday, Jan. 15, 1964, Thornton told Lt. Luby that he was unable to get the lime juice through his normal supply route and suggested that some be purchased locally. Lt. Luby gave Thornton permission to buy it.[9]

On Friday, Jan. 17, 1964, Thornton went on "liberty" at 4:30 p. m. After having dinner at home, he drove to a grocery store to purchase maple sugar for his wife. While he was at the store, he remembered the lime juice he had promised to obtain for the Oasis. He then decided to purchase the lime juice and deliver it to the club. Thornton delivered the juice to the club between 6:30 and 7:00 p. m. He remained at the club for approximately three and one-half hours drinking bourbon and water, chatting,

1. Thornton Dep. No. 1, pp. 36, 37.

2. Luby Dep. p. 4.

3. Luby Dep. pp. 13–14; Thornton Dep. No. 1, pp. 52–53.

4. Luby Dep. p. 12.

5. Luby Dep. pp. 13, 14.

6. Ibid.

7. Thornton Dep. No. 1, pp. 48, 49.

8. Luby Dep. p. 10.

9. Luby Dep. pp. 9, 12; Thornton Dep. No. 1, pp. 43, 45.

playing shuffleboard and watching a bartender whom he suspected of misconduct.[10]

About 10:15 p. m. Thornton left the club to go home. On his way from Fort Miles to Lewes, Delaware, Thornton's 1955 Cadillac collided with the car in which plaintiff, Diane Short, was a passenger.

In determining whether an employer may be held liable for the torts of his employee, the court must focus on the moment when the tort occurred. At that point the various measures of respondent superior must be brought to bear.

▪ Generally, when an employee is going to or returning from his place of employment, the courts have recognized the "going and coming" rule. This doctrine relieves the employer from liability for the employee's torts for the employee is regarded as being outside the scope of his employment.[11] Although it is difficult to establish the boundaries of the scope of employment limitation of the respondent superior doctrine, the purpose of the limitation is a means of allocating risk. Only the risks of carrying on the business should be cast on the business. However, not all the risks of the personnel connected with the business should be attributable to the enterprise, but only those which are normally associated with it.[12] Generally, the master's sole concern with the employee's activities commences when the employee arrives at the place of employment, and terminates when he departs. Thus, in this situation, it is unreasonable to foist upon the employer the risk involved in the employee's travel to and from work.

▪▪ However, an exception to this general rule has developed when the employer calls the employee away from his home (or his regular place of work) for the master's purpose. The master incurs the normal risks inherent in the employee's travels. There is a difference between traveling to one's regular job and doing a special assignment. When on a "special errand" for the master, the master's concern encompasses the employee's conduct enroute to and from the place of special duty. It is expected that the enterprise will absorb the risks of the employee's travels for the enterprise is receiving the benefits from them. This theory has been embodied in the "special errand" or "special mission" exception to the "going and coming" rule.[13] The special errand doctrine has been stated:

"If the employee is not simply on his way from his home to his normal place of work or returning from said place to his home for his own purpose, but is coming from his home or returning to it on a special errand either as part of his regular duties or at a specific order or request of his employer, the employee is considered to be in the scope of his employment from the time that he starts on the errand until he has returned or until he deviates therefrom for personal reasons. * * *" Boynton v. McKales, 139 Cal.App.2d 777, 294 P.2d 733 at 740 (1956).

To apply this test to the present case, various factual inferences must be drawn and issues resolved. For example, what were Thornton's instructions, was he to merely go from the base to the store and return, or was it reasonable for him to interpret the instructions to deliver the lime juice at night, especially in view of his instruction concerning the bartenders; what were these other instructions; and if on a special errand, did he depart from its scope when he stayed at the club and drank for three hours? Numerous

10. Thornton Dep. No. 1, pp. 43–47.

11. See Anno., 52 A.L.R.2d 287 et seq.

12. See Mecham Outlines Agency §§ 365–373 (4th Ed. 1952).

13. See Church v. Ingersoll, 234 F.2d 176 (10 Cir. 1956) cert. den. 352 U.S. 879,

77 S.Ct. 101, 1 L.Ed.2d 80; Boynton v. McKales, 139 Cal.App.2d 777, 294 P.2d 733 (1956); Anno. 52 A.L.R.2d 287, 313. For cases applying special errand in the context of Workmen's Compensation see 8 Schnieder Workmen's Compensation Text § 1732 (3rd Ed. 1951).

reasonable inferences can be drawn from the facts to answer these questions. These inferences must be drawn before it can be determined whether the special errand doctrine is applicable.

Of course, if no further evidence is presented at trial, the court would have to draw the most plausible inferences; however, a fuller development of the facts would prove helpful to the court. Moreover, the demeanor of the witnesses can be observed in resolving the conflict concerning the instructions to observe the bartenders given by Lieutenant Luby to Thornton.

A slightly different approach, which would alleviate the strict application of the "going and coming" rule, would be applicable in this case depending on the trier's conception of the nature of Thornton's duties.

■ One whose duties are managerial in nature and who serves his employer's interests at various times and in various places should not be subject to a rule intended to limit an employer's liability for his employee's acts to a specific place during specific hours. The "going and coming" test is geared to a usual place of work in normal working hours. Thus, a more flexible approach is necessary where employees on a managerial or executive level are concerned.

This rationale was applied in Wilson v. Steel Tank & Pipe Co. of Oregon, 152 Or. 386, 52 P.2d 1120 (1935). In that case the Vice President of defendant corporation injured the plaintiff while returning from inspecting the installation of certain equipment in a brewery after the closing hour. In deciding that the question of the corporation's liability should go to the jury, the court said:

"Dierking, who was an officer of the Steel Tank & Pipe Company, and who went to Vancouver instead of the president, is to be distinguished from an ordinary laborer who is employed a certain number of hours and whose responsibility to his employer ends when his day's work is done." Wilson v. Steel Tank & Pipe Co. of Oregon, 52 P.2d 1120 at 1124.

The court noted further:

"It is the contention of appellant that in any event Dierking terminated his day's work when he left the brewery at Vancouver, and that at the time of the accident he was on his way home. If, as we think the jury was warranted in believing, Dierking went from Portland to Vancouver on a mission for his company and in the furtherance of its interests, it was just as much a part of his duty to return to Portland, which he was doing when the accident happened, as it was in going [sic] from Portland to Vancouver." Wilson v. Steel Tank & Pipe Co. of Oregon, supra, 52 P.2d at p. 1124.

As in the application of the "special errand" doctrine, various factual inferences must be drawn as to whether this "relaxed special errand" rule [14] is applicable to the present case.

■ Plaintiffs' motion that the court grant a partial summary judgment holding Thornton to be a servant of the United States acting within the scope of his employment at the time of the accident in question is denied.

Defendant's motion for summary judgment is denied.

Present order.

14. The two can be conceptually viewed as one. The duties of a manager can be considered a series of special errands rather than a 9–5 job.